## Case No. 17,787.

### WILSON v. BARNUM.

[1 Wall. Jr. 347; [1] 2 Fish. Pat. Cas. 635; 6 West. Law J. 464; 48 Jour. Fr. Ins. 208.]

Circuit Court, E. D. Pennsylvania. Nov. 13, 1849.

VALUE OF GRANT OF PATENT—INJUNCTION—SECOND TRIAL—DIVIDED COURT.

1. The grant of a patent at the patent office, is not of itself, or in virtue of section 7 of the act of July 4, 1836 [5 Stat. 119], a bar to an interlocutory injunction in favour of a person claiming to be a prior patentee of the same thing; such person not having received notice at the patent office to appear and be heard, and the court on a hearing before it, being well satisfied that the last patent is an interference with the one granted before.

[Cited in Morse Fountain Pen Co. v. Esterbrook Steel Pen Manuf'g Co., Case No. 9,862.]

2. The district judge sitting for the circuit court, and being himself well satisfied of an infringement,—although, of numerous experts examined, a majority thought differently from him on that point,—may grant an interlocutory injunction to restrain the use of a patented machine as an infringement of a prior one; the machine last patented not having been granted after notice from the patent office to the complainant, to appear and be heard.

3. Where a jury has had a case before it and disagreed, a second trial cannot be had by another jury from the residue of the panel. The case must go over in order that it may be tried on a new venire.

4. Where the district judge, sitting for the circuit court, and being satisfied of an infringement, had granted an interlocutory injunction till trial, to restrain the use of a machine, and the president judge, after hearing the evidence before the jury on the trial, differed from his brother, who after hearing the same evidence, still retained his former opinion, and the jury could find no verdict; the full court, in its subsequent action on the injunction, need not consider itself either as bound or as unable to dissolve it: but the action upon it may be modified; the modification being largely regulated by what probably would have been the original action of a full court.

This was a bill for an interlocutory injunction, to restrain the defendant from using a patented machine which it was said interfered with another machine previously patented to the complainant. The defendant did not deny the originality of the complainant's invention, but asserted his own to be no infringement of it. The complainant's patent was an ancient one. The defendant's had been granted under the act of July 4, 1836 (section 7), which directs, that whenever a person applies for a patent, an examination shall be made by the commissioner of patents into the originality of the alleged invention; and allows the issuing of a patent only in case the commissioner is satisfied that the invention is original. If, on examination, the commissioner thinks that there is an interference, he then gives (Act July 4, 1836, § 8) notice to the patentee with whose invention he supposes that the interference takes place, and lets him be heard. In this case the com-

1 [Reported by John William Wallace, Esq.]

missioner did not consider that there was an interference, and of course the complainant had no notice of the intended issue to the defendant.

Mr. Hirst and Mr. Stoughton of New York, relying, among other grounds, including those of fact, upon this first provision of the act, opposed the grant of an injunction. The defendant, they contended, has a patent which gives him a prima facie case everywhere. He has a right to trial by jury. It was impossible to regard his machine as so palpably or so probably an infringement, as to warrant the summary process of injunction, when the commissioner of patents, who has every means at command for ascertaining originality, and employs them all, has regarded it as too manifestly original to cause a question. The act of the commissioner may not have been a judicial decree in form; nor have the technical conclusiveness of a precedent, and a res adjudicata. But it deserves every respect short of that, and will receive the highest respect as the investigation and a decision on the matter by an officer of state, to whom the investigation and decision are primarily and particularly intrusted. It is quasi judicial, at least.

Mr. W. H. Seward of New York, Mr. St. G. T. Campbell and Mr. S. V. Smith, mentioned several cases where the commissioner had issued patents, after notice to prior patentees who came in and defended their rights, which patents had been afterwards pronounced, judicially, to be infringements. In this case there had been no notice to the complainant or to any body. The commissioner issued the patent upon first impressions. He had not perceived any infringement, only because none had been shown to him. His act was extra-judicial; and if it were not, would be at best but a judgment without either writ, plea, issue or argument. Even if there had been a hearing, the grant could not be a legal objection. It could not be pleaded nor put in evidence. It would at best be an extra-judicial opinion of more or less weight. If this court—after a judicial examination—is thoroughly satisfied of the interference, it will not regard such an act as conclusive on its conscience.

KANE, District Judge, sitting for the circuit court. There are cases under the present laws, in which the court would enter reluctantly upon the discussion of the validity of a patent. Some of the provisions of the act of 1836, give a quasi-judicial character to the action of the commissioner of patents; and it has accordingly been held, I believe generally, as well as justly, that the patent itself is to be taken as prima facie evidence of the novelty and usefulness of the invention specified in it. There are other cases, in which the official action of the patent office claims properly, a still higher degree of consideration. Whenever antagonist patentees, or third persons generally, have been first

called in, it is reasonable to consider the action as a preliminary adjudication upon their rights. And this for the obvious reason, that they have been parties, or but for their own fault might have been parties, to the proceeding on which the adjudication was based. But this is the limit, beyond which comity cannot be required to go. It cannot be asked, that a third person shall have his legal rights impaired, or his legal remedies impeded, by any proceeding to which he was not, and could not have been made himself a party. To hold ourselves concluded by the action of the patent office, where that action has been without notice, would be as perilous to the interest of inventors as to that of the publick. We had a case in our own court not long since, where an injunction was sought against the real inventor, on the faith of a patent granted to a surreptitious claimant. The grant of a patent to the defendant can therefore have no other effect on the present discussion, than as it indicates the opinion, which highly respectable and skilful officers have formed, on an ex parte examination of the case.

2 [We come then to the principal question: Does the machine, now in use by the defendant, embody the principle of the complainant's patent? The judicial definition of a patent, or of the principle it involves, in a case under trial, is properly, if not necessarily, a limited one. It regards primarily, and as a matter of course, the circumstances of the pending controversy. The identity or the difference between two machines is sought, in the first place, by a comparison of them either in their elements or as a system; and we are commonly said to define their mechanical principles, when, after making such a comparison, we indicate the essential particulars in which they are alike, or otherwise. A new comparison of the patented machine with another, not before the subject of adjudication, as it presents new points of similarity or variance, calls for a different expression of the principle of the patent. The aspect of the invention changes as we approach it in a new direction, and parts become prominent that were subordinate before, and that involve perhaps important relations to the question in dispute. For this reason, the cases upon the Woodworth patent, which are found in the Reports, as well as those which have been determined in this court, give, for the purposes of the present inquiry, an imperfect definition of the principle of the invention. In all of those cases, the machine complained of carried the planks through it on an unvarying plane, which was tangential to the revolving motion of the planing knives, and the planing knives were set on the periphery of the revolver; in both of these particulars resembling the Woodworth machine. In Mr. Barnum's, the cutting tool is set on the face of a rotating disc, and the plank advances in a plane par-

allel, it is said, with the disc, till the operation of planing is completed, and is then deflected from the machine; thus, at the first glance, differing throughout, as well from the Woodworth machine, as from other machines, with which the Woodworth has been compared on former occasions.

[What then shall we regard as the principle of the Woodworth invention, when viewing it in connection with the machine of the defendant? We shall, perhaps, be led to the answer by tracing the history of this important class of labor-saving machines. Before the present century, it had been deemed an object of much interest to adapt some combination of machinery to the work of smoothing the surface of boards. The mechanical difficulties in the way were these: (1) That the cutting tools, if made to work parallel to the external surface of the plank, encountering all the sand and grit that adhered to it, soon lost their edge, and became incapable of producing a uniform surface; (2) that if the tools were made to cut otherwise than parallel to the surface, so as to pass through the gritty exterior, instead of along it, the plank would be alternately driven down as the tools struck it, and lifted up as they left it, and would thus have a constant and rapid vibration under the action of the machine.

[The engine devised by Mr. Bramah, in 1802, was so contrived as to get rid of the first of these difficulties. His cutting knives were placed on the side or surface of a circular rotating disc; but beyond them, at the extreme periphery, he placed a set of projecting rough cutters, which struck the plank as it advanced in the same plane with the disc, and before it reached the planing knives, and removed the outer surface to which the grit adhered. His machine was imperfect, however, for, in consequence of the elasticity of the plank, as well as of the machinery, and the vibration due to the rapid but intermitting action of his tools upon the plank, his cutters, after completing their work, would, as they revolved, come in contact again with the finished surface, and score it irregularly.

[Woodworth's machine was the next which I need to refer to. He affixed his cutters to the periphery of a revolving cylinder, and advanced the plank towards them, under strong pressure, in a plane tangential to their motion; thus making the cutters describe a curve upwards from the finished surface, through the rough surface of the plank, and preventing the plank from vibrating sensibly during the operation. This machine did its work effectively and well. The plank, moving firmly along the tangent plane of the rotating cylinder, passed beyond the reach of the cutters, and was disengaged from the action of the machine at the moment the work was perfected.

[This was imitated in the Gay and the Mac-Gregor machines, in which a flattened cone or dished plate wheel was substituted for the cylinder. By this change the corrugated sur-

2 [From 6 West. Law J. 464.]

face, which is left by the Woodworth machine, was avoided; the action of the cutters being very nearly in a line parallel to the surface of the plank, and therefore producing shavings, instead of the chips which are thrown out by the Woodworth cutters. But as the curve in which the cutters acted became one of a larger circle, the deflexion between it and the plane of the plank's motion was, of course, less rapid than in the Woodworth machine, thus increasing, in some degree, the liability of the finished part of the plank to receive the same injury from vibration which was the characteristic defect in the action of the Bramah machine. Nevertheless, when the Gay and MacGregor machines were before this court some three years ago, it was held that they infringed upon the Woodworth principle, inasmuch as they contained the revolving cutter acting upon a plank in the tangent plane of the revolver.

[The next machine to be described is that of the defendant. Its appearance is in many respects similar to Gay's, though it differs materially in others. It has the Bramah disc, with its two sets of rough and finishing cutters; but the plank is made by a very ingenious contrivance to advance along a metallic guide, either in a straight or slightly curved line, till it comes beneath the axis of the disc, when by a turn in the guide it is bent outwards over a small roller, and thence passes from the machine in a line similar to that by which it approached it. The finishing cutters begin to act upon the plank in a line very nearly parallel to its surface, and complete their work as the plank turns over the roller. We have thus a machine that cuts in a right plane upon a curved surface; the revolving disc, at the moment of finishing the work, forming a tangent plane to the curve of the advancing plank. We have, too, a roller, over which the plank is forcibly bent, and which, by its resisting pressure against the elasticity of the plank, holds it steady under the action of the cutters. That is to say, we have a machine just the converse, as well as the equivalent, of that invented by Woodworth. One general expression may include them both,—a planing machine, in which the cutters and the material move against each other in a curve and in its tangent plane, respectively; the material being kept from vibrating by roller pressure. It is true that in one machine it is the cutter which follows the curved path, while the material moves along the plane, and that in the other the cutter moves in a plane, and the material is acted on in the curve; but there is no other difference.

[Is this then, a difference of principle? Can it be said that the essential character of a machine is varied by a mutual interchange or form and direction between the two elements of which it is a combination, while both object and effect remain as before? Does not the question, in its very terms, suggest Lord Tenterden's illustration in the Percussion Lock Case [Minter v. Wells], Webst. Pat. Cas. 128, of those analogous contrivances, the bringing up of an anvil against the hammer, and the bringing down of the hammer against an anvil? We may recognize differences of details in the defendant's machine, both as to the means and the effect; and these may properly be patented as improvements upon the Woodworth invention, perhaps highly meritorious ones. But, considered as independent combinations, I cannot escape the conclusion, that, whether the plank or the cutter have the curvilinear motion, if the other moves in a plane, and the two are made to act and react upon each other, for the same object, and with the same effect, the machines are in principle identical.] [2]

My only embarrassment in awarding an injunction, has been owing to the fact, that of the highly educated mechanicians whose affidavits have been taken in the cause, the greater number have expressed an opinion different from that expressed by me. The consideration which was pressed in the argument, that the responsibility of deciding this question, might with propriety be devolved on a jury, has had no influence with me. That judicial morality might be impeached for infirmity, which could shrink from awarding to a party his remedy after ascertaining his rights. "The right of a party to the most speedy and effectual protection against a meditated wrong, is as complete as his right to redress for wrongs already inflicted; and the accident of position confers no right on one party, whether he be plaintiff or defendant, at the expense of the other. The special injunction in equity, like the arrest on mesne process at law, may be abused to the injury of an opponent; but it is no less on that account the duty of the judge to further them both, when, in the exercise of his best discretion, he believes that they are called for by the merits and the exigency." This was the language of the court when on a former occasion this patent was before us, and my experience since has not taught me that it ought to be modified. The preventive interposition of equity, is very often the only effective resort of a meritorious patentee, and where the facts of the case are not controverted, I am by no means satisfied that it is not the safest for both parties. There is no conflict of evidence here; the question is one of deduction and opinion. Were the case at this time under trial at bar, it would be the office of the judge to interpret the specification, and define the principle of the invention. This is the only point of difficulty, and it must be encountered by the judge, when he sits on one side or other of the court. To send the cause to a jury, would be to delay its adjudication for many months, leaving the complainant in the meantime with his legal rights suspended, and swelling the measure

---

[2] [From 6 West. Law J. 464.]

of the defendant's liabilities. I should do injustice to both parties, were I, with my present views of the merits of this controversy, to refuse the injunction. Injunction awarded.

At the following sessions, the validity of the patent came on to be tried upon an issue directed to a jury; but after a thorough examination and argument, the jury could not agree and were discharged.

Mr. Hirst and Mr. W. W. Hubbell, having now shewn that a great number of licenses, about to expire within a fortnight, were waiting for renewal upon the decision of the right, and that it was otherwise very important to their client and the publick, that the right should be decided at once; moved for a second trial at this same term, by a new jury selected out of the existing panel, instead of waiting as they would otherwise have to do, until the next session, a term of six months.

Mr. St. G. T. Campbell opposed the application.

GRIER, Circuit Justice. An application of this same sort was made to me in a case while I presided in the district court at Pittsburgh, where the case went off by withdrawing a juror. A decision from one of the Ohio or Indiana courts was then cited in support of the motion. In consequence of that decision, I looked thoroughly into the matter at the time, and was satisfied that the decision was not founded in principles of the common law and was wrong. I have no doubt that a settlement of this patent right, at once, is important, but it cannot be tried now except by consent. There must be a second venire. Motion refused.

On a subsequent day, it having appeared by a communication from the bench that the court, after full argument on the evidence, were divided on the question of infringement, and the jury having been unable to find a verdict, Mr. Hirst and Mr. W. W. Hubbell, moved to dissolve the injunction absolutely. It had been granted by the district judge, they argued, in the absence of his brother, who now after full examination, came to the conclusion that there was no infringement. Had the latter judge been present when the injunction was applied for, the court being divided, would not have granted it; and if it could, would not. A jury had moreover refused to pronounce that there was any infringement. This, supported by the action of the patent office, which regarded the invention as original, and by the patent which gave a prima facie right, made a clear case for a jury alone.

W. H. Seward, St. G. T. Campbell, and S. V. Smith, in favour of continuing the injunction, argued that the act of either judge, sitting for the circuit court, was the act of the court. As a circuit court, each judge is of absolute equality. It is impossible to say, what the circuit judge's opinion would have been, had he heard the argument for the injunction. That is a matter past and gone, and of which no judical cognizance could now be taken. Each judge was satisfied of the correctness of his own opinion: and whether each chose to rely on his own, or each to defer to his brother's, the court would still be equally divided. In that state of things, what could be done? Simply nothing. The injunction would stand of its own force. The inability of the jury to find a verdict, Mr. Seward argued, was of no significance. They had been summoned to settle the matter, and they had not settled it, but left it where it was. Had they even found a verdict it would have been of little value unless approved by the court, who, if disapproving of it, would have set it aside. No verdict was of no value.

GRIER, Circuit Justice, expressing the high respect he entertained for the opinion of his Brother KANE, particularly upon questions relating to patents, and KANE, District Judge, stating that from the time he found that a difference of opinion existed between him and the presiding judge upon the question of infringement, his inclination was to have the matter disposed of, as if the court had been full when the injunction was applied for; and both members of the court —in the difference of opinion which existed between them, and which it seemed could not be removed—being desirous of protecting both parties to the suit from any errours which might exist by either dissolving absolutely, or absolutely continuing the injunction, made an order to this effect: That the injunction should be dissolved if the defendant in ten days should give security in $10,000 to keep an account, &c. and pay, &c. in case of a final decree being entered against him. On his failure to give such security, then in case the complainant should in ten days afterwards give security in $20,000, the injunction to stand; and in default of his giving such security, to be dissolved without condition.

[For other cases involving this patent, see note to Gibson v. Van Dressar, Case No. 5,402.]